1

2

3

4

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

5

6

7

8

9

10

| | |
|---|---|
| SEAN R. KELLEHER, | No.  CV-13-3108-SMJ |
| Plaintiff, | |
| v. | **ORDER DENYING PLAINTIFF'S MOTION TO EXCLUDE AND GRANTING IN PART AND DENYING IN PART DEFENDANTS MOTIONS FOR SUMMARY JUDGMENT** |
| FRED MEYER STORES, INC., | |
| Defendant. | |

11

12

13

14

15

16

17

18

This matter came before the Court on January 7, 2015 for a motion hearing on Defendant's Motion for Partial Summary Judgment Dismissal on Plaintiff's Non-Public Policy Claims, ECF No. 66.  Plaintiff Sean Kelleher was represented by Elizabeth Hanley[1] and Defendant was represented by Keller Allen.[2]  At the hearing, after hearing argument from the parties, the Court took the matter under advisement.  Also pending before the Court without oral argument were Plaintiff's Motion to Exclude Defendant's Purported Expert Witness, ECF No. 58,

19

20

---

[1] Counsel is reminded that in the future, Local Rule 10.1 requires that all "documents, including any exhibits, shall be sequentially paginated in their entirety, with the page number appearing at the bottom of each page" (emphasis added).  Accordingly, while most exhibits were properly number, citation herein which reference declarations with exhibits that are not paginated shall be cited as "ECF No. at 'Exhibit No.'"

[2] Counsel is reminded that in the future, Local Rule 5.1 requires a three-hole punched and tabbed courtesy copy of any filing in excess of 100 pages, *see* ECF No. 69.

ORDER - 1

Defendant's Motion for Partial Summary Judgment Requesting Dismissal of Plaintiff's Public Policy Claim, ECF No. 46, and Defendant's Second Motion for Partial Summary Judgment Requesting Dismissal of Plaintiff's Public Policy Claim, ECF No. 53. Having reviewed the pleadings, the record in this matter, the applicable case law, and the arguments of counsel, the Court is fully informed and rules as follows.

## I.    BACKGROUND

### A.    Factual Background[3]

Defendant Fred Meyer operates retail stores, located in Oregon, Washington, Idaho, and Alaska, that combine a number of departments, including a pharmacy, under one roof. Beginning in 2002, Defendant employed Plaintiff Sean Kelleher in its Ellensburg, Washington Fred Meyer store as a Pharmacy Manager, where she was paid overtime for hours worked in excess of forty per week. During the course of Plaintiff's employment, Defendant had Plaintiff register with the Washington State Board of Pharmacy as the "responsible manager" for the Ellensburg pharmacy. The responsible manager "shall ensure that the pharmacy complies with all the laws, rules and regulations pertaining to

---

[3] In ruling on the motion for summary judgment, the Court has considered the facts and all reasonable inferences therefrom as contained in the submitted affidavits, declarations, exhibits, and depositions, in the light most favorable to the party opposing the motion. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999). However, in considering the facts, the Court does not rely on conclusory allegations unsupported by factual data, *Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993), nor does the Court rely upon facts contained in affidavits which directly contradict the affiants prior disposition testimony, *Burrell v. Star Nursery, Inc*., 170 F.3d 951, 955 (9th Cir. 1999).

the practice of pharmacy. Every portion of the establishment coming under the jurisdiction of the pharmacy laws shall be under the full and complete control of such responsible manager." WAC 246-869-070.

As the pharmacy fell within the purview of the food department, Plaintiff reported directly to the store's Food Manager. During Plaintiff's employment there were multiple Food Managers, including Chris Ewald, Chris Warth, and Ryan Shilley. Also at the Ellensburg store was Store Director Ryan Cheney who was responsible for the overall operation of the entire store. As Food Managers and Store Directors are not trained in pharmacy specific operations like regulations and drugs, Fred Meyers has Pharmacy Coordinators or Pharmacy Regional Supervisors who coordinate pharmacy functions, establish guidelines, and assist store personnel with pharmacy specific issues. The Ellensburg store is located in Fred Meyers District 6, where the Pharmacy Coordinator for the relevant time period was Berkeley Fraser, who supervised 19 Fred Meyer pharmacies in Washington and Idaho. Finally, during the relevant time period, the person responsible for the entire pharmacy business of Fred Meyer was the Pharmacy Merchandiser Marc Cecchini.

Defendant required employees to read and sign an Associate Responsibilities form which set forth specific rules employees were to follow and identifies whether termination or a warning would be issued for their violation.

ORDER - 3

Plaintiff signed and acknowledged this policy when she began her employment and on subsequent occasions, including most recently on February 26, 2012. ECF No. 69-1 at 85-89. Under the policy conduct that "Will Result in Immediate Termination Without Prior Warning" includes "Dishonesty of any kind" and provides as an example "[u]nauthorized conversion to personal use or removal of company money, merchandise, or other property from company premises; committed alone or in conjunction with another person(s)." ECF No. 69-1 at 89. The policy also provides that "[f]ailure to perform work as required" and "[w]orking 'free time' or working overtime without specific approval of the person-in-charge" is conduct that "Will Result in Disciplinary Action But Which Usually Results in Termination After Prior Warning." *Id*.

At all Fred Meyer stores, the optimal ratio is the number of hours earned or projected for a department or store. The manager's goal in running a department or store was to be within 98% to 103% of that number. The number of hours a particular pharmacy was permitted to schedule on a weekly basis was determined mainly by the number of prescriptions processed in that pharmacy in the previous eight weeks. For the pharmacy, the Food Manager could authorize additional hours if it was financially responsible to do so.

Fred Meyer policy is to allow non-union employees to take up to 26 weeks of medical leave, concurrent with Family Medical Leave Act ("FMLA") leave, if

the employee properly documents the medical need. Plaintiff took one week of leave in 2004, twelve weeks of leave in 2009 to 2010, and seventeen weeks of leave in 2011.

In April 2006, Plaintiff received a positive performance evaluation by Food Manager Chris Ewald. ECF No. 68-1 at 9. The evaluation indicates Plaintiff was consistently over in hours and was not seeking overtime authorization. *Id*. at 11. Plaintiff was advised to better communicate with the Food Manager and Store Director when overtime was needed. *Id*. at 20.

In May 2007, Plaintiff received a positive performance evaluation by Food Manager Chris Ewald. ECF No. 68-1 at 22-28. The evaluation indicates Plaintiff could "have done a better job at controlling hours and [overtime]." *Id.* at 24.

On November 30, 2007, Defendant terminated Lori Nelson, Pharmacy Manager in Bend, Oregon, for violating company policy by removing company property from the pharmacy, specifically for removing the perpetual inventory book and paper prescriptions from the store. Ms. Nelson's employee records indicate she was discharged for "VIOLATION OF COMPANY POL" and states "Rehire? Y." ECF No. 96-19.

On May 22, 2008, Plaintiff complained to Pharmacy Coordinator Fraser that with a technician on leave and two others leaving, the pharmacy was

understaffed.  ECF No. 68-1 at 30.  Mr. Fraser responded indicating they were attempting to find additional staff to assist at the pharmacy.  *Id.*

On April 9, 2009, Plaintiff raised concerns to Mr. Cecchini and Mr. Fraser that the "workload is getting ridiculous with the current staffing."  ECF No. 68-1 at 32.

In April 2009, Plaintiff's 2009 evaluation prepared by Food Manager Chris Warth, which evaluates her 2008 conduct, denotes "meets expectations" and again set a goal of continuing to reduce overtime hours.  ECF No. 68-1 at 38.

Starting on November 25, 2009, and continuing until February 18, 2010, Plaintiff took twelve weeks of protective leave.

In May 2010, Food Manager Warth prepared Plaintiff's 2010 evaluation, which evaluated her 2009 conduct as meeting expectations.  ECF No. 68-1 at 40-45.  The evaluation includes improving communication regarding breaks and lunches in order to stop overtime.  *Id.* at 42.  Plaintiff comments on the evaluation that "management should reevaluate how they are allotting hours in the pharmacy."  *Id.* at 44.

On December 5, 2010, Food Manager Shilley emailed Plaintiff inquiring why the pharmacy had incurred 12.84 hours of overtime the previous week.  ECF No. 69-1 at 91.  Mr. Shilley, noting that the pharmacy was accruing a lot of

incidental overtime, instructed Plaintiff to follow up daily with each associate that accrued incidental overtime.  *Id.*

Plaintiff took leave under FMLA and Fred Meyer policy between April 26, 2011, and August 21, 2011.  Upon Plaintiff's return she was employed as a full time Pharmacy Manager.  However, Plaintiff maintains in this lawsuit that upon return the terms and conditions of her employment had substantially changed.

While Plaintiff was on leave, in May 2011, Erik Sundet, the Pharmacy Manager for the Ellensburg store, was counseled by his Food Manager on his 2011 evaluation that "[i]n 2012 [he] will need to concentrate on the daily control of hours and Overtime. [sic] There are T&A reports available to isolate his [overtime]."  ECF No. 106 at 31.

When Plaintiff returned after August 21, 2011, as in previous years, she was expect to complete the health screenings of the other employees, but was the only person in the pharmacy at that time qualified to conduct screenings.  Plaintiff maintains she was not given more hours to conduct the screenings and had to complete them by October 31, 2011.

After Plaintiff's return, on September 2, 2011, Plaintiff sent a letter to Mr. Cecchini advising of staffing difficulties since her return, difficulty scheduling health screenings, and concern that Store Director Cheney and Food Manager Shilley had complained numerous times about overtime and changes in the

schedule that had not been approved, but had occurred before her return to work. ECF No. 69-1 at 100-101.  Mr. Cecchini directed she should have a meeting with Pharmacy Coordinator Fraser and Store Director Cheney to find a solution.  *Id*.

On October 21, 2011, Food Manager Shilley instructed Plaintiff on areas where she was not meeting expectations, including adding both hours and overtime hours without approval.  ECF No. 69-1 at 109.  He also counseled her to not contact Mr. Fraser for issues that do not pertain to "a specialist."  *Id*.  Also at some point in October 2011, Mr. Shilley sought to use store cashiers to assist the pharmacy staff, including at one point bringing a cashier to the pharmacy to work. Plaintiff, explaining to Mr. Shilley that all staff had to be licensed, refused to permit any unlicensed cashiers to work in the pharmacy, but offered to train additional cashiers to become licensed.  ECF No. 97-1 at Exhibit 15.

On November 3, 2011, an unruly patient came to the pharmacy and apparently became violent and threatening.  When he returned the next day and again became unruly, pharmacy staff called the police.  Mr. Shilley subsequently criticized Plaintiff, indicating that the police should not have been called.  ECF No. 69-1 at 106-108.

On November 5, 2011, Plaintiff emailed Mr. Shilley indicating overtime had been incurred after not receiving any assistance and advising overtime would occur again the next day.  The email conversation that ensued was forwarded by

Mr. Shilley to Mr. Cheney with the comments "I cannot handle this by myself.. She is impossible." ECF No. 69-1 at 110. Mr. Fraser was then advised that Plaintiff was continuing to incur overtime and Mr. Cheney alleges Plaintiff was combative when confronted. *Id.* By November 12, 2011, Plaintiff was allowed an additional eight hours per week from a Yakima technician, ECF No. 69-1 at 112, though the quality and duration of her assistance is disputed.

Due to the complaints made regarding Mr. Shilley's conduct toward Plaintiff and pharmacy staff, as well as Plaintiff's disagreement with the Store Director and Food Manager, Mr. Fraser had the Human Resource Regional Supervisor Cindy Baker travel to Ellensburg to investigate. It appears Mr. Fraser alerted Ms. Baker that accusations and complaints were coming from the Ellensburg store as early as September 15, 2011. ECF No. 69-2 at 187. On November 16, 2011, Plaintiff provided Ms. Baker her concerns including the 911 incident, her need for approval for more hours, and Mr. Shilley's behavior toward her.

By December 5, 2011, Ms. Baker had advised Plaintiff that overtime must first be approved by calling, not emailing, the person in charge, and advised that Plaintiff's staff, like other pharmacy staff, was required to take one hour lunch breaks. ECF No. 69-1 at 115. Ms. Baker indicates her intent to follow up with

other pharmacies that were allegedly not following the company one-hour lunch policy. *Id*.

Also, on December 5, 2011, Store Director Cheney advised Mr. Fraser and Ms. Baker that Plaintiff had added 13 hours and 14 overtime-hours the previous week without approval. On December 8, 2011, Plaintiff emailed Mr. Cheney regarding taking a couple vacation days. ECF No. 69-1 at 117. The emails indicate a later conversation occurred between Plaintiff and Mr. Cheney in his office regarding scheduling and the number of hours needed to run the pharmacy. *Id*. On December 16, 2011, Mr. Cheney verbally advised Plaintiff that she must call him or the manager on duty before adding any overtime or leaving a shift early. ECF No. 69-1 at 119.

In December 2011, Food Manager Shilley prepared Plaintiff's 2011 evaluation, evaluating her 2010 performance as "Needs Improvement." ECF No. 69-1 at 94-99. Mr. Shilley commented in the review that "[w]e need to focus on the huge impact that overtime has on our wage [percentage]. We need to be properly staffed, and have flexibility in our schedule to be able to work through the busy times without using overtime." *Id*. at 94.

Plaintiff maintains that throughout 2011 and 2012 when she requested overtime it was consistently denied, but due to Defendant's instructions that the requests should be by telephone there exists no documentation of these requests.

1    In April 2012, Food Manager Shilley prepared Plaintiff's 2012 evaluation,

2    evaluating her 2011 performance as "Meets Expectations." ECF No. 69-1 at 120-

3    127. On the evaluation regarding sales and budget, Plaintiff comments:

> Ebitda would have been better if we didn't have Cameron (our relief
> agency's) wages for 4 months on and off when I had sick leave.
> Pharmacist's salaries become huge when an agency is used; about
> three times as much per hour . . . It is very difficult to run the
> pharmacy with such a skeleton crew. We have no per diem people,
> and now there is no one to replace a technician's or pharmacist's
> vacation when due.

8    *Id*. at 120. Mr. Shilley then makes the following comment:

> The pharmacy department had a great year last year. Sean is correct
> about missing wages due to Cameron charges. . . Sean needs to
> continue to work with the PRX managers at Yakima and Wenatchee
> to be fully staffed, so when a vacation arises we can work as a team
> and share help back and forth.

12   *Id*. Mr. Shilley notes that "Sean has done an outstanding job as the pharmacy

13   manager, since returning from her LOA," *id*. at 122, and "I am very impressed

14   with the direction that Sean herself, and her team have taken in the last 6 months."

15   *Id*. at 124. At this same time, in Wenatchee, Pharmacy Manager Sundet was

16   counseled by his Food Manager that he "just needs to focus every week on

17   overtime to achieve his [overtime] goal." ECF No. 106 at 24.

18   From March 19, 2012 until August 20, 2012, (after Plaintiff was

19   terminated) Renee Svendsen was on FMLA leave. That leave was then extended

ORDER - 11

through November 29, 2012, after which Ms. Svendsen returned to her full-time Pharmacy Technician position.

From June 11, 2012 until October 1, 2012, (after Plaintiff was terminated) Megan Wickham was on FMLA leave. When Ms. Wickham took leave she was employed as a full-time Pharmacy Technician, consistently working second shift. Upon her return, she sought to either work a part-time position or return full-time to the same position but only to either first or second shift and not the last shift or weekends. She requested Pharmacy Manager Kunz, Plaintiff's successor, allow her to work second shifts. He refused, maintaining she had to be available for any and all hours the pharmacy was open. After being denied her request, Ms. Wickham signed a "resignation" letter and moved to *per diem* status, but within a year was no longer employed by Defendant. While Plaintiff was still employed, she supported Ms. Wickham's efforts to get a part-time position created for her anticipated return.

On July 6, 2012, Defendant hired a new full-time pharmacy technician, Annie Lowther, to work at the Ellensburg pharmacy. Plaintiff maintains she raised concerns with Mr. Cheney and Mr. Vanderpool regarding how both Ms. Wickham and Ms. Svendsen were going to be able to return to their full-time positions with the hiring of Ms. Lowther as a full-time technician.

*//*

In early August 2012, Store Director Cheney received a tip from Dana Matthews, a part-time pharmacy employee, that Plaintiff was taking prescription documents home. ECF No. 69-2 at 193. Mr. Cheney then called the corporate regional human resource office and regional loss prevention for instructions on how to proceed regarding the tip. It was determined Heath Breckenridge, Ellensburg's Loss Prevention Manager, would do a parcel check. Mr. Breckenridge learned of the tip on August 3, 2012. ECF No. 69-1 at 133. Plaintiff did not work August 4, 2012, through August 6, 2012.

On August 6, 2012, Plaintiff emailed Mr. Cecchini indicating she was having staffing concerns with her two best technicians out and only a new fulltime technician, a one-year licensed technician, a licensed casher, and two one-year licensed pharmacists and indicated that the "pharmacy lines are ridiculous, 14 people deep at times" and that "I still have over 3000 Rx's to put in order and file away." ECF No. 69-1 at 128. On August 7, 2012, Mr. Cecchini sent the email to Store Director Cheney and Pharmacy Coordinator Fraser. *Id.*

On August 8, 2012, beginning at 5:05 PM, while the store and pharmacy were still open, Mr. Breckenridge observed Plaintiff shopping with a cart in which a black Fred Meyer tote was stored. When Plaintiff approached the associate exit around 5:20 PM, Mr. Breckenridge stopped Plaintiff and inspected her items. Plaintiff admitted that the papers in her cart were prescriptions and that she was

taking them home to put in filing order.  Mr. Breckenridge observed the tote contained hundreds of prescription papers and a couple of files sitting on top of them.  After the inspection, Plaintiff left the store with the prescriptions and Mr. Breckenridge called Store Director Cheney to report the situation.

Plaintiff admits that for the preceding six weeks she had been taking the prescriptions home overnight to separate and organize into packs of 100, verify the validity of the prescriptions, and identify which prescriptions would require follow-up the next day.  Plaintiff justifies removing the prescriptions because she was not getting adequate help or hours at the pharmacy to keep up with record keeping requirements, and fearing the loss of her license due to non-compliance with recordkeeping regulations, took the prescriptions home.  On a date that is unknown, Plaintiff maintains that she sent Pharmacy Coordinator Berkeley Fraser a photograph via text message, ECF No. 97-2 at Exhibit 21, which purports to depict the prescriptions on Plaintiff's dining room table, but it is undisputed that Mr. Fraser never replied to the message and he testified that he did not receive it. There is no evidence that a message of any kind accompanied the photograph.

After Mr. Breckenridge reported to Mr. Cheney that he observed Plaintiff removing prescriptions from the store, they contacted Pharmacy Coordinator Fraser.  Mr. Fraser advised that it was not acceptable for Plaintiff to leave the pharmacy with written prescriptions, and that he believed Fred Meyer had

terminated someone for that same conduct. Mr. Fraser recommended that human resources department get involved in deciding what action to take. At some point, Mr. Cheney contacted Labor and Associate Relations Administrator Tricia Breque regarding Plaintiff's conduct. While the depositions before this Court do not indicate who made the final decision to terminate Plaintiff, the limited recollection of the deponents indicates it was a collaborative process, the standard practice would have been to vet the matter with human resources, and that each person recalled Plaintiff was terminated for violating company policy by taking company property in removing prescriptions from the store. There is no evidence that Food Manager Shilley was involved in the decision to terminate Plaintiff.

On August 13, 2012, Store Director Cheney told Plaintiff she was terminated for taking prescriptions home in violation of Section 1.a. of the Fred Meyer Associate Responsibilities form, which provides under the category of dishonesty that an employee will be immediately terminated without warning for "[u]nauthorized conversion to personal use **or removal of company** money, merchandise, or other **property from company premises**; committed alone or in conjunction with another person(s)." ECF No. 69-1 at 89 (emphasis added). Plaintiff's termination report indicates the termination reason as "Dishonesty" and states "Rehire Y/N: No." ECF No. 96-26.

//

1    After Plaintiff was terminated, Defendant hired Daren Kunz to replace her

2  as Pharmacy Manager.

3    In March 2013, during a routine inspection at the Wenatchee Fred Meyer,

4  the Department of Health discovered that Pharmacy Manager Sundet had allowed

5  two unlicensed pharmacy assistants to work in the pharmacy.  The pharmacy was

6  issued an unsatisfactory rating.  Subsequently, on March 19, 2013, a follow-up

7  inspection discovered that Mr. Sundet had permitted the two unlicensed pharmacy

8  assistants, whose licenses were now pending approval, to continue to work in the

9  pharmacy.  The pharmacy was issued a second unsatisfactory rating.  On March

10  29, 2013, Mr. Sundet was issued a "First Last and Final" warning notice for

11  "[f]ailure to perform work as required" by permitting two associates to work in

12  the pharmacy without licenses.  ECF No. 106 at 3.  On August 22, 2013, the

13  Department of Health issued a Notice of Correction which threatened formal

14  disciplinary action if corrective measures were not taken, but the notice itself did

15  "not constitute formal disciplinary action." ECF No. 69-5 at 290-91.  The incident

16  was also logged with his licensing records.  ECF No. 96-8 at 17.  Mr. Sundet later

17  received a satisfactory performance review and retained his job.  Mr. Sundet's

18  personnel file also indicates he received a warning notice on June 5, 2014, for

19  "[f]ailure to perform work as required," specifically, failing to follow policies and

20  guidelines for record keeping of controlled substances.  ECF No. 106 at 1-2.

Plaintiff points to three other pharmacy managers who were disciplined by Defendant. "Patrick," in September 2014, was provided written notice for "[f]ailure to perform work as required," when record keeping and inventory violations were discovered. ECF No. 86, Exhibit P. "Susan," in September 2014, was provided written notice for "[f]ailure to perform work as required," when multiple errors were found including not being in possession of her keys at all times. ECF No. 86 at Exhibit Q. Lastly, "Karen," in June 2010, received a verbal warning when she gave a patient a prescription meant for another patient. ECF No. 86 at Exhibit R.

Finally, both parties have submitted extensive documentations of scheduled and worked hours at the Ellensburg pharmacy during Plaintiff and her successor's employment. *See e.g.* ECF Nos. 96-36, 110-1, & 116. Neither party has provided any statistical evaluation of those numbers. On their face, the numbers do indicate that 1) in 2011 the pharmacy operated with a low of 187 hours and a high of over 260 hours, 2) in 2012 during Plaintiff's employment the pharmacy operated with a low of 191 hours and a high over 270 hours, 3) after Plaintiff was terminated the pharmacy operated with a low of 178 hours to a high of over 260 hours, and 4) that generally the number of hours fluctuated from week to week. *Id.*

//

/

**B.    Procedural Background**

Plaintiff filed her Complaint on October 4, 2013, alleging Defendant Kroger Company and Fred Meyer Stores, Inc., violated the Family Medical Leave Act (FMLA), the Washington Family Leave Act (WFLA), Title VII of the Civil Rights Act of 1964 (Title VII), the Pregnancy Discrimination Act, the Washington Law Against Discrimination (WLAD), and wrongfully terminated Plaintiff in violation of public policy, resulting in unlawful deprivation of wages.  ECF No. 1. On February 18, 2014, Plaintiff sough leave to amend her Complaint, ECF No. 18, without objection from Defendants, ECF No. 26, which was granted April 7, 2014.   Plaintiff's Amended Complaint added allegations Defendants further violated FMLA and WFLA in reprimanding Plaintiff for exercising her right to medical leave.  ECF No. 27.  On July 2, 2014, this matter was reassigned, ECF No. 29, and an Amended Scheduling Order was issued, ECF No. 31.  On July 31, 2014, the parties filed a stipulated dismissal of Defendant Kroger Company, ECF No. 33, that was subsequently granted, ECF No. 34.  On October 8, 2014, and October 20, 2014, Defendant filed for partial summary judgment regarding elements of Plaintiff's public policy claim.  ECF Nos. 43 & 56.  On October 31, 2014, Plaintiff's filed a Motion to Exclude Defendant's proposed expert witness Dr. William Fassett.  ECF No. 58.  After the Court granted the parties' requested extension of the discovery cutoff and dispositive motion deadline, ECF No. 57,

Defendant filed for summary judgment on all of Plaintiff's non-public policy claims.  ECF No. 66.

## II.    **PLAINTIFF'S MOTION TO EXCLUDE**

Plaintiff seeks to exclude Defendant's proposed expert, Dr. William E. Fassett, which Defendant has proposed as an expert on the standard of practice for the pharmacy profession.

## A.    **Legal Standard**

An expert witness may testify at trial if the expert's "specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702.  A witness must be "qualified as an expert by knowledge, skill, experience, training, or education" and may testify "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  *Id.*; *see also Kumho Tire v. Carmichael*, 526 U.S. 137, 141, 148–49 (1999).  The "trial judge must ensure that any and all [expert] testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).  "Concerning the reliability of non-scientific testimony . . . the Daubert factors (peer review, publication, potential error rate, etc.) simply are not applicable to this kind of testimony, whose reliability depends heavily on the knowledge and experience of

the expert, rather than the methodology or theory behind it." *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004) (citations omitted). In such cases, the Court's gatekeeping role under *Daubert* involves probing the expert's knowledge and experience. *See id.* at 1018. An expert may not go so far as to make legal conclusions or opinions on the ultimate issue of law. *See Hangarter v. Provident Life & Ins Co.*, 373 F.3d 998, 1016 (9th Cir. 2004). Furthermore, instructing the jury as to the applicable law is "the distinct and exclusive province" of this Court. *United States v. Weitzenhoff*, 35 F.3d 1275, 1287 (9th Cir. 1993). "It is the proponent of the expert who has the burden of proving admissibility." *Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996). Admissibility of the expert's proposed testimony must be established by a preponderance of the evidence. *See Daubert*, 509 U.S. at 592 n. 10 (citation omitted).

**B.    Discussion**

First, Dr. Fassett is qualified to be an expert based upon his education, experience, and knowledge. As a professor to pharmacy students at Washington State University and author of numerous publications addressing professional and legal obligations of pharmacists, Dr. Fassett has specialized knowledge. Accordingly, the Court finds him qualified to be an expert.

*//*

1    Truly at issue is not Dr. Fassett's qualification but what he may testify

2 about, if anything.  Plaintiff asserts that the proposed testimony is not relevant,

3 provides legal conclusions, and will confuse and mislead the jury.  ECF No. 58.

4 However, Defendant has conceded that Dr. Fassett 1) "will not opine about the

5 reason [Plaintiff] was terminated", 2) "will not offer any opinion on an ultimate

6 issue of law", and 3) "will not testify regarding hypothetical ways Kelleher could

7 have violated the law or ethics."  ECF No. 61.  Instead, Defendant maintains Dr.

8 Fassett will explain that a reasonable and prudent pharmacy manager in

9 Washington would know that removing prescriptions from the pharmacy violates

10 professional and legal standards with which all pharmacists must be familiar and

11 comply.

12    Here, the Court finds the proposed testimony to be relevant, admissible, and

13 not unduly prejudicial to Plaintiff.  Plaintiff has consistently maintained and

14 opined that she removed prescriptions from the pharmacy so she would not violate

15 the law and risk losing her license.  Defendant is entitled to rebut Plaintiff's

16 opinions and justifications for her conduct.  To do this Defendant, in addition to

17 witnesses from Fred Meyers, has proffered Dr. Fassett to opine that the reasonably

18 prudent pharmacy manager would not have taken the prescriptions home.

19 Because Plaintiff has placed the matter at issue, the Court will not exclude Dr.

20 Fassett.  However, if at trial his testimony deviates impermissibly into why

Plaintiff was terminated or opines on the ultimate issue of law, such can be addressed by timely objections at trial. Accordingly, Plaintiff's motion is denied.

### III.    <u>MOTIONS FOR SUMMARY JUDGMENT</u>

Across three separately filed motions, ECF Nos. 46, 53, & 66, Defendant seeks summary judgment on Plaintiff's public policy, FMLA interference, retaliation, and wage claims.

**A.    Legal Standard**

Summary judgment is appropriate if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once a party has moved for summary judgment, the opposing party must point to specific facts establishing that there is a genuine dispute for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). If the nonmoving party fails to make such a showing for any of the elements essential to its case for which it bears the burden of proof, the trial court should grant the summary judgment motion. *Id.* at 322. "When the moving party has carried its burden under Rule [56(a)], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (internal citation omitted) (emphasis in original). When

considering a motion for summary judgment, the Court does not weigh the evidence or assess credibility; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). When considering the summary judgment motion, the Court 1) took as true all undisputed facts; 2) viewed all evidence and drew all justifiable inferences therefrom in non-moving party's favor; 3) did not weigh the evidence or assess credibility; and 4) did not accept assertions made that were flatly contradicted by the record. *See Scott v. Harris*, 550 U.S. 372, 380 (2007); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

**B.    Discussion**

    1.    <u>Public Policy Claim</u>

    Plaintiff maintains she was wrongfully discharged in contravention of a clear mandate of public policy. The "public policy" exception to the at-will doctrine, was expressly adopted by the Washington Supreme Court in *Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 232 (1984). The essence of the public policy exception is that an employee will have "a cause of action in tort for wrongful discharge if the discharge of the employee contravenes a clear mandate of public policy." *Id.* at 232. A public policy claim arises in one of four circumstances where an employer discharges an employee for 1) refusing to

commit an illegal act, 2) performing a public duty or obligation, 3) exercising a legal right or privilege, or 4) engaging in whistle blowing activity.  *Dicomes v. State*, 113 Wn.2d 612, 618 (1989).  Here, Plaintiff proceeds under the first category, refusing to commit illegal acts.

To establish a public policy claim, Plaintiff must prove: 1) the existence of a clear public policy (the clarity element), 2) that discouraging Plaintiff's conduct would jeopardize the public policy (the jeopardy element), 3) that Plaintiff's conduct caused the discharge (the causation element), and 4) Defendant's justification was invalid or pretextual (absence of justification element).  *Korslund v. Dyncorp Tri-Cities Servs.*, Inc., 156 Wn.2d 168,178 (2005).  Plaintiff has the burden to establish each element of a public policy claim.  *Ellis v. City of Seattle*, 142 Wn.2d 450, 459 (2000).  Each of the public policies raised by a plaintiff must be scrutinized under the four-part test.  *Gardner v. Loomis Armored Inc.*, 128 Wash. 2d 931, 942 (1996).  Before the Court are the clarity, jeopardy, and justification elements.

a.    <u>Clarity Element</u>

The clarity element requires establishing the existence of a clear mandate of public policy and is a question of law for the court.  *Hubbard v. Spokane Cnty.*, 146 Wash. 2d 699 (2002).  A clear public policy is not founded upon the

1  subjective belief of an employee, rather, it must result from legislative action or

2  judicially recognized by a prior court decision. *Thompson*, 102 Wn.2d at 232.

3      Defendant argues Plaintiff must set forth a public policy permitting her to

4  remove prescriptions from the store, as the "actions she took." ECF No. 89 at 5.

5  However, this is too narrow of a reading of Plaintiff conduct. While she

6  undisputedly removed prescriptions from the store, Plaintiff's theory of the case is

7  that the removal was the conduct she engaged in to keep the store compliant with

8  recordkeeping requirements, which she puts forth as a public policy. *See Gardner*

9  *v. Loomis Armored Inc.*, 128 Wn.2d 931, 942 (1996) (in addressing the clarity

10  element, the Court did not focus on finding a public policy of a truck driver

11  leaving a vehicle, but instead looking at public policies that justified the reasons

12  for leaving the vehicle). Accordingly, the removal of prescriptions is best

13  addressed in relation to the jeopardy and justification element, and not as the

14  conduct at issue for the clear public policy element.

15      Plaintiff's theory is that she was terminated for her conduct of refusing to

16  commit three illegal acts: 1) employing unlicensed employees in the pharmacy,[4]

17  2) not maintaining recordkeeping requirements for controlled substances, and 3)

18

---

19  [4] Defendant correctly notes that this allegation is not plead in Plaintiff's Complaint or Amended Complaint.
   Additionally, Plaintiff factual support for the allegation makes no reference to testimony in Plaintiff's deposition
   where this allegation arose. *See Awosika v. Target Corp.*, No. C11-185RSM, 2012 WL 1855788, at *1 (W.D.
20  Wash. May 21, 2012) (rejecting similar insufficiently-pled argument by defense but were the matter had arose in
   the deposition and defense had already re-opened discovery and continued the trial). As the Court address the
   matter on the merits below, whether it is sufficiently pled is moot.

ORDER - 25

not permitting the pharmacy to be out of compliance with state and federal pharmaceutical regulations in contravention of her duties as the responsible manager. ECF No. 70 at 5. Each of these is a clearly defined obligation under the law. *See* RCW 18.64A.040 ("ancillary personnel shall practice pharmacy in this state only after authorization by the commission and only to the extent permitted by the commission"); RCW 18.64.245 ("The record shall be maintained either separately from all other records of the pharmacy or in such form that the information required is readily retrievable from ordinary business records of the pharmacy. All recordkeeping requirements for controlled substances must be complied with."); 21 CFR 1304.04(h) ("Each registered pharmacy shall maintain the inventories and records of controlled substances as follows. . ."); WAC 246-869-070 (The "'responsible manager,' who shall ensure that the pharmacy complies with all the laws, rules and regulations pertaining to the practice of pharmacy. Every portion of the establishment coming under the jurisdiction of the pharmacy laws shall be under the full and complete control of such responsible manager"). Accordingly, the Court finds the clarity element has been well established because the conduct Plaintiff maintains she refused to engage in are specifically addressed and required by statute.

//

/

b.    _Jeopardy Element_

Under the second element, the employee's discharge must jeopardize the public policy.  "To establish jeopardy, plaintiffs must show they engaged in particular conduct, and the conduct directly relates to the public policy, or was necessary for the effective enforcement of the public policy."  *Gardner v. Loomis Armored Inc.*, 128 Wn.2d 931, 945 (1996).  "Additionally, the plaintiff must show how the threat of dismissal will discourage others from engaging in the desirable conduct."  *Id*.  While the question whether the jeopardy element is satisfied generally involves a question of fact, *Hubbard*, 146 Wn.2d at 715, the question whether adequate alternative means for promoting the public policy exist may present a question of law where the inquiry is limited to examining existing laws to determine whether they provide adequate alternative means of promoting the public policy.  *See id*. at 716–17.  When looking at legislative acts, "the question is not whether the legislature intended to foreclose a tort claim, but whether other means of protecting the public policy are adequate so that recognition of a tort claim in these circumstances is unnecessary to protect the public policy."  *Korslund*, 156 Wn.2d at 183.  "The other means of promoting the public policy need not be available to a particular individual so long as the other means are adequate to safeguard the public policy."  *Hubbard*, 146 Wn.2d at 717.

//

Here, the second and third public policies advanced by Plaintiff are factual interconnected.   Generally, Plaintiff maintains Defendant refused to provide sufficient experienced staff and enough pharmacy hours to permit Plaintiff, as the responsible manager, to keep the pharmacy compliant with the law, chiefly maintaining a safely operated pharmacy and maintaining proper filing of prescription.   When Plaintiff was denied staffing and hours, record keeping fell behind such that over 3000 prescriptions still needed to be filed.   To keep the record keeping compliant, Plaintiff spent six weeks taking the prescriptions home to organize and sort but despite her efforts she maintained on August 6, 2012 that the unfiled count was at 3000.   In taking the prescriptions home, despite Plaintiff's insistence to the contrary, Plaintiff violated numerous pharmacy laws.   *See* 21 C.F.R. § 1304.04(h)(2) ("Paper prescriptions for Schedule II controlled substances shall be maintained **at the registered location** in a separate prescription file") (emphasis added); RCW 18.64.245 ("Such record of prescriptions shall be for confidential **use in the pharmacy, only**. . . . (2) A person violating this section is guilty of a misdemeanor."); WAC 246-869-020 (2), (4).   However, while Plaintiff's removal of the prescriptions was illegal conduct, it was still related to the public policy.   Accordingly, the question before this Court is whether there was an adequate alternative.

//

The Court finds that the Washington Health Care Act ("WHCA") provided an adequate alternative. The WHCA permits a health care professional to report alleged quality of care concerns to the Department of Health. RCW 43.070.075(2)(c). The act provided a whistleblower with the Human Rights Commission protections and remedies pursuant to chapter 49.60 RCW. The Act defines improper quality of care to mean "any practice, procedure, action, or failure to act that violates any state law or rule of the applicable state health licensing authority under Title 18." RCW 43.070.075(2)(a). Because Defendant is a pharmacy owner, the Department of Health has licensing power over Defendant. RCW 18.64.165. Similarly, the Washington Court of Appeals has similarly held that the WHCA can provide an adequate alternative. *See Worley v. Providence Physician Servs. Co.,* 175 Wn.App. 566 (2013).

Plaintiff argues the WHCA does not apply because she was not a whistleblower and she could never have filed a complaint in good faith because the law was never violated. ECF No. 76 at 16-77. However, this argument is not well taken. First, to be an adequate alternative Plaintiff need not be a whistleblower, just that she should, or could, have been, and that the statutory provisions provides an alternative to protecting the public policy, not necessarily protecting Plaintiff's license. Additionally, if Defendant was not supplying sufficient staffing and hours to run the pharmacy such that 3000 prescriptions

ultimately piled up by August 6, 2012, it is difficult how a good faith belief that Defendant had a "practice . . . that violates . . . state law" would not exist. Accordingly, the Court finds the WHCA provides an adequate alternative to protect the second and third public policies asserted by Plaintiff.

However, the same cannot be said for Plaintiff's first public policy, refusing to permit unlicensed employees to work in the pharmacy. In fall 2011, Plaintiff refused Mr. Shilley's attempt to place an unlicensed cashier in the pharmacy. When Plaintiff refused, Mr. Shilley allegedly got mad and stormed off. A similar instance arose with a Target Corporation pharmacy manager in Redmond, Washington, when she refused to permit an unlicensed employee to work in the pharmacy. *See Awosika v. Target Corp.*, No. C11-185RSM, 2012 WL 1855788, at *1 (W.D. Wash. May 21, 2012) (also finding a clear public policy existed). In *Awosika*, the proposed alternative of the pharmacy board could not reach the human resource employee at issue. *Id.* at *7. Here, under the WHCA, a complaint to the Department of Health can certainly result in discipline for Defendant.

However, the Court still finds that the WHCA does not adequately protect the public interest of preventing unlicensed employees from working in the pharmacy. Unlike the previous asserted public policies, where the events at issue manifested from practices over the course of weeks and months, when refusing

Mr. Shilley's attempt to place an unlicensed cashier in the pharmacy, no such recourse to the department of health is as effective at preventing an unlicensed person's entry into the pharmacy than refusing when the request is made. Accordingly, the Court finds that permitting a tort claim for responsible managers who refuse to permit unlicensed personnel into the pharmacy is necessary to enforce the public policy and to not discourage engaging in the desirable conduct.

### c.    *Absence of Justification Element*

"The last element inquires whether the employer has an overriding reason for terminating the employee despite the employee's public-policy-linked conduct." *Gardner*, 128 Wn.2d at 945. "This fourth element of a public policy tort acknowledges that some public policies, even if clearly mandated, are not strong enough to warrant interfering with employers' personnel management." *Id*. The Court must balance the public policies raised by plaintiffs with any legitimate interests raised by defendants in maintaining a work rule. *Id*.  For the fourth element, the burden shifts to the employer to offer an overriding justification for the dismissal. *Brundridge v. Fluor Fed. Servs., Inc*., 164 Wn.2d 432, 440 (2008). The employer has the burden of production for this element, but the ultimate burden of persuasion remains with the employee to show that the employer's justification was pretextual. *Wilmot v. Kaiser Aluminum & Chem. Corp*., 118 Wn.2d 46, 68 (1991).

Here, Defendant maintains Plaintiff was properly terminated for removal of prescription records from the pharmacy, which violated the company policy that provided for immediate termination for removal of company property. While the issue of pretext is discussed in considerably greater detail below, based upon the comparator evidence available no reasonable jury could find or infer that Defendant's justification was pretext for impermissibly terminating Plaintiff for refusing to violate the law by allowing an unlicensed cashier into the pharmacy. Accordingly, Plaintiff's public policy claim is dismissed.[5]

## 2.    FMLA and WFLA Interference Claims

The FMLA recognizes two separate claims for violation of its provisions: 1) interference claims in which employers burden or outright deny substantive statutory rights to which an employee is entitled under 29 U.S.C. § 2615(a)(1); and 2) retaliation claims in which employers discharge employees for exercising their FMLA right to leave under 29 U.S.C. § 2615(a)(2). *Bachelder v. America West Airlines, Inc.*, 259 F.3d 1112, 1124 (9th Cir.2001). In the Ninth Circuit, claims alleging that an employer took adverse employment action against an employee for taking or asserting a right to take FMLA leave are treated as Section

---

[5] While no motion was pending before the Court regarding the causation element on Plaintiff's first public policy claim of being terminated for refusing to permit an unlicensed cashier into the pharmacy, the Court notes that Mr. Shilley's alleged conduct occurred in October 2011, ten months before Plaintiff was terminated. There is no other evidence in the record before the Court during those ten months regarding any additional unlicensed employee refusals by Plaintiff. Accordingly, without more, the Court would find there is insufficient evidence to demonstrate causation. *See Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273 (2001) (lapse of three for fourth months is too long to infer causation from mere temporal proximity alone).

2615(a)(1) interference claims, rather than Section 2615(a)(2) discrimination claims, "which applies only to employees who *oppose* employer practices made unlawful by FMLA. *Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1133, n. 7 (9th Cir. 2003). The WFLA "mirrors its federal counterpart and provides that courts are to construe its provisions in a manner consistent with similar provisions of the FMLA." *Washburn v. Gymboree Retail Stores, Inc.,* 2012 WL 5360978 *7 (W.D.Wash. Oct. 30, 2012).

It is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the FMLA. 29 U.S.C. § 2615(a)(1). When "an employee alleges that his or her FMLA leave is impermissibly considered in the decision to terminate him or her, this Circuit applies the standard set forth by the [Department of Labor (DOL)] in 29 C.F.R. § 825.220(c)." *Bachelder*, 259 F.3d at 1122. Under the DOL standard, employers cannot use the taking of FMLA leave as a negative factor in employment actions. *Id.* at 1124, citing 29 C.F.R. Section 825.220(c). This is because an employer's attachment of negative consequences to an employee's exercise of medical leave rights "tends to chill," and therefore interferes with, the employee's willingness to exercise those rights. *Id.* The Ninth Circuit has held the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), does not apply to interference claims under § 2615(a)(1). *Liu*, 347 F.3d at 1135. "[The damages

provision of FMLA,] § 2617, provides no relief unless the employee has been prejudiced by the violation." *Ragsdale v. Wolverine World Wide, Inc*., 535 U.S. 81, 89 (2002). Plaintiff may show prejudice by establishing that the FMLA violation "rendered [her] unable to exercise [her FMLA rights] in a meaningful way, thereby causing injury." *Conoshenti v. Public Serv. Elec. & Gas Co*., 364 F.3d 135, 143 (3rd Cir. 2004). *See Edgar v. JAC Prod., Inc*., 443 F.3d 501, 510 (6th Cir. 2006) (noting that there is no FMLA claim if the employee suffered no damages as a result of the employer's conduct).

Plaintiff appears to be maintaining two separate theories of an interference claim. First, at oral arguments, Plaintiff took the position that the environment Plaintiff returned to after taking leave, and the treatment she maintains she was subjected to, was itself interference with her FMLA rights by creating an environment that tends to chill exercising her rights. Even if true, Plaintiff has not demonstrated how this environment and treatment caused her injury that is actionable under FMLA. Accordingly, as no prejudice has been shown, on this theory the claim must be denied.

Second, Plaintiff argues in her responsive briefing, ECF No. 93, that her FMLA leave was a negative factor in her August 2012 termination. However, insufficient evidence exists for a jury to find that her August 2011 leave was a negative factor in her August 2012 termination. First, because a full year

transpired between her leave and her termination, there must be more evidence than timing alone to draw an inference that the leave was a negative factor in the decision to terminate her employment. *See Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273 (2001) (stating that a lapse of three for fourth months is too long to infer causation from mere temporal proximity alone). Plaintiff puts forth her managers' actions in the fall of 2011 along with her alleged denials for overtime and better staffing in 2012 as the evidentiary basis demonstrating that her leave was a negative factor in her termination.[6] During this period she also received a glowing April 2012 evaluation, was never given written warning for performing unauthorized overtime,[7] and was terminated five days after removing company property. On this record, no reasonable juror could make the inferences necessary to connect the 2011 leave with the 2012 termination. Accordingly, Plaintiff's interference claim is dismissed.

     3.     <u>FMLA, WFLA, Title VII, Pregnancy Discrimination, and WLAD Retaliation Claims</u>

Plaintiff's Amended Complaint asserts that she was retaliated against for opposing unlawful employment practices, specifically standing up for individuals that were on protected leave, including for a pregnancy.

---

[6] Plaintiff also cites to her April 2012 evaluation, however, the only comments in that evaluation regarding her leave was added by Plaintiff, and the context does not indicate any negative connotation associated to her leave.

[7] The Associate Responsibilities form specifically permits a written warning for "working overtime without specific approval of the person-in-charge" as conduct that "Will Result in Disciplinary Action But Which Usually Results in Termination After Prior Warning." ECF No. 69-1 at 89.

Under the FMLA, 29 U.S.C. § 2615 (a)(2), it is "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." *Sanders v. City of Newport*, 657 F.3d 772, 777 (9th Cir. 2011). An allegation under this section is a retaliation or discrimination claim. *Id*. In *Bachelder v. Am. W. Airlines, Inc.*, the Ninth Circuit expressly did not decide whether the burden shifting framework articulated in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), should be applied to retaliation claims under § 2615(a)(2). 259 F.3d 1112, 1125, n. 11 (9th Cir. 2001). The Ninth Circuit acknowledged, however, that most other circuits have adopted some version of the *McDonnell Douglas* burden shifting framework. *Sanders*, 657 F.3d at 777. District Courts in the Ninth Circuit have used the *McDonnell-Douglas* framework in the analysis of § 2615(a)(2) claims. *See, Bushfield v. Donahoe,* 912 F.Supp.2d 944, 953 (D.Idaho 2012).

Under the McDonnell Douglas framework, a plaintiff must establish a prima facie case of retaliation. *Id*. To establish a prima facie case of retaliation, a plaintiff must show 1) she availed herself to a protected right, 2) she was adversely affected by an employment decision, and 3) there is a causal connection between the two actions. *Crawford v. JP Morgan Chase NA*, 983 F. Supp. 2d 1264, 1269 (W.D. Wash. 2013) (FMLA) (citing *Washington v. Fort James Operating Co*., 110 F.Supp.2d 1325, 1331 (D.Or. 2000) (FMLA)). *See also*

*Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006) (Title VII); *Bergene v. Salt River Project Agric. Improvement & Power Dist.*, 272 F.3d 1136, 1140–41 (9th Cir. 2001) (Title VII).   An employee engages in protected activity when she opposes an employment practice that either violates the law or that the employee reasonably believes violates that law.  *See Freitag v. Ayers*, 468 F.3d 528, 541 (9th Cir. 2006) (Title VII).   Under Title VII, Plaintiff must prove that her protected activity was the "but-for" cause of her termination, *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2521 (2013), while under the WLAD, Plaintiff must prove that her protected activity was a "substantial factor" in Defendant's decision to terminate her employment, *Allison v. Hous. Auth. of City of Seattle*, 118 Wash. 2d 79, 95 (1991) (rejecting the "but for" standard of causation because WLAD requires a more liberal causation standard).   The "requisite degree of proof necessary to establish a prima facie case . . . on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence."  *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994).

If a prima facie case is established, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse action.  *Sanders*, 657 F.3d at 777, n. 3.  If the employer articulates a legitimate reason for its action, the burden shifts back to the plaintiff to show the reason given is pretext.  *Id.*

Pretext can be proven indirectly, by showing the employer's explanation is not credible because it is internally inconsistent or otherwise not believable, or directly, by showing unlawful discrimination more likely motivated the employer. *Id.*

### a.   *Prima Facie Case*

It is undisputed that Plaintiff suffered an adverse employment action when she was terminated in August 2012.  However, the parties dispute whether she engaged in a protected activity and whether that was the cause of the termination.

Taking the evidence in Plaintiff's favor, in July 2012, she raised concerns with her supervisors and human resource personnel regarding how Ms. Wickham, on FMLA leave for pregnancy, and Ms. Svendsen, out on protective FMLA leave, were going to get their full-time positions back with the hiring of a new, full-time pharmacy technician.  Taken in Plaintiff's favor, these concerns are sufficient for a jury to find that Plaintiff was opposing what she reasonably believed were discriminatory practices.  Additionally, as Plaintiff engaged in this conduct in the months leading up to her termination, there is sufficient evidence to meet the low threshold necessary for a prima facie case to infer a causal connection.

### b.   *Legitimate Reason for Adverse Action*

Defendant maintains it legitimately terminated Plaintiff for violation of company policy.  Specifically, Defendant maintains that when Plaintiff admittedly

took prescriptions home, she removed company property in violation of the Associate Responsibilities form. The form specifically provides under the category of dishonesty that an employee will be immediately terminated without warning for "[u]nauthorized conversion to personal use **or removal of company** money, merchandise, or other **property from company premises**; committed alone or in conjunction with another person(s)." ECF No. 69-1 at 89 (emphasis added).

Plaintiff's argues that this was not legitimate because 1) she was never dishonest, 2) she did not commit theft or conversion, and 3) no rule exists saying pharmacy managers could not temporarily remove prescriptions. These arguments are not well taken. First, when Plaintiff and Defendant agreed to the Associate Responsibilities form, they agreed that removal of company property was an example of dishonest conduct. Accordingly, it is entirely immaterial that Plaintiff never lied about removing prescription. Second, nothing in the cited policy provision requires that Plaintiff commit theft or conversion. While conversion is one way to violate the rule, it specifically states "conversion to personal use **or** removal." ECF No. 69-1 at 89 (emphasis added). Accordingly, the fact that Plaintiff intended to return the prescriptions is irrelevant to whether company property was removed. Finally, while the rule does not enumerate prescriptions, the only way it could not apply to a pharmacy manager's removal is

if prescriptions were not company property.  However, during the period in which the records must be retained, the law clearly places ownership of the records upon Defendant.  *See* 21 C.F.R. § 1304.04(a) ("every inventory and other records required to be kept under this party must be kept by the registrant and be available"); 21 C.F.R. § 1304.04(h) ("Each registered pharmacy shall maintain the inventories and records of controlled substances . . . (4) Paper prescriptions . . . shall be maintained at the registered location . . ."); WAC 246-869-020 ("A pharmacy must provide adequate security for its supplies and records . . . All equipment and records . . . must be kept in the pharmacy areas."); RCW 18.64.245 ("Every proprietor or manager of a pharmacy shall keep readily available a suitable record of prescriptions . . . Such record of prescriptions shall be for confidential use in the pharmacy, only.").  It is telling that RCW 18.64.245 specifically address not only a proprietor, i.e. Defendant Fred Meyer, but also a pharmacy manager, i.e. Plaintiff, in the requirement that records must be available and for confidential use only in the pharmacy, with "only" offset for emphasis by a comma.  Title 21 of the United States Code even contemplates that when a pharmacy is sold the records have to be transferred to the new owner.  *See* 21 U.S.C. § 360eee ("any records required to be maintained for the product shall be transferred to the new owner of the pharmacy . . .").  Accordingly, any

representation that removal of prescription records from the pharmacy was not

removal of company property or a violation of the law is in error.

Therefore, the Court finds that Defendant has sufficiently demonstrated a

legitimate nondiscriminatory basis for terminating Plaintiff.

c.    *Pretext*

While Plaintiff has provide sufficient evidence to support an inference of

discrimination, and thus has met her burden on her prima facie case, that evidence

may still be insufficient to raise a genuine issue of material fact regarding the truth

of a Defendant's proffered nondiscriminatory reasons or that a discriminatory

reason more likely motivated Defendant to terminated Plaintiff's employment.

*See Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1094 (9th Cir. 2001)

citing *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

However, a "plaintiff can survive summary judgment without producing any

evidence of discrimination beyond that constituting h[er] prima facie case, if that

evidence raises a genuine issue of material fact regarding the truth of the

employer's proffered reasons." *Id*. (citations omitted).

To demonstrate pretext, Plaintiff relies not only upon the evidence of

causation but also maintains that Defendant's justification is not believable when

compared to similarly situated employees.  For comparators, Plaintiff points to

four other pharmacy managers 1) Sundet, given "First Last and Final" warning for

failure to perform work as required by continuing to permit two associates to work in the pharmacy without licenses, 2) Patrick, provided written notice for failure to perform work as required when record keeping and inventory violations were discovered, 3) Susan, provided written notice for failure to perform work as required when multiple errors were found including not being in possession of her keys at all times, and 4) Karen, who received a verbal written warning when she gave a patient a prescription meant for another patient. Defendant also points to Pharmacy Manager Lori Nelson who was terminated in 2007 for removal of company property when she removed prescriptions from the pharmacy.

While Plaintiff maintains that this comparison to the other pharmacy managers demonstrates disparate treatment, the Court disagrees. While Plaintiff, Sundet, Patrick, Susan, Karen, and Nelson all in some way violated pharmaceutical regulations with their conduct, how their conduct could be applied to the Associate Responsibilities form is not similar. Specifically, the conduct engaged in by Sundet, Patrick, Susan, and Karen does not fall within any enumerated conduct under Section I, which provides for immediate termination without prior warning. ECF No. 69-1 at 89. Accordingly, Defendant could not have immediately terminated Sundet, Patrick, Susan, or Karen without a prior warning as it was bound by its own progressive discipline agreement with its employees. Providing a written warning for "[f]ailure to perform work as

required" was the most punitive option available for their conduct that violated pharmaceutical regulations.  By contrast, both Plaintiff and Nelson removed prescriptions from the pharmacy, which the law clearly treats as company property.  Accordingly, the Associate Responsibilities form provided Defendant the ability to immediately terminate both Plaintiff and Nelson for their conduct. Based upon Plaintiff's conduct, the only alternative categorization of her behavior would have been a written warning citing her for either "[f]ailure to perform work as required" when she violated pharmaceutical regulations requiring that prescriptions be maintained at the pharmacy or for "working 'free time'" when she worked from home.  Therefore, the only subjective application of the policies would have required Defendant to ignore the removal of company property, to ignore the prior termination of Nelson, and to provide preferential treatment to Plaintiff by categorizing her conduct under Section II, which requires a prior warning.  Such preferential treatment is not required under the law.  Defendant had two pharmacy managers remove prescriptions, Plaintiff and Nelson, and Defendant terminated both. *See Laing v. Fed. Exp. Corp.*, 703 F.3d 713, 721 (4th Cir. 2013) (finding no genuine issue existed as to pretext where only comparator evidence supported defendant's nondiscriminatory explanation for termination). Accordingly, comparing Plaintiff to Defendant's other pharmacy managers, the

Court finds no triable issue of fact regarding pretext exists, and Defendant is entitled to summary judgment on Plaintiff's retaliation claims.

4.    Wage Claim

Defendant asks this Court to dismiss Plaintiff's claim that she was not compensated for unauthorized hours worked off-the-clock as it was not pled in her Amended Complaint. ECF No. 66 at 20. Plaintiff Amended Complaint states in pertinent part that she was suing for violations under FMLA, WFLA, Title VII, WLAD, and the tort of wrongful termination in violation of public policy "as well as *resulting* unlawful deprivation of wages pursuant to RCW 49.48, *et seq*. and RCW 49.52, *et seq*." ECF No. 27 at ¶ 1 (emphasis added). However, contained nowhere in the Amended Complaint exists any plain statement of facts regarding an independent claim of Plaintiff's entitlement to compensation for unauthorized overtime. Accordingly, as the claim is not in the Amended Complaint the Court finds it is insufficiently pled.

Plaintiff asks in her responsive briefing for leave to amend. ECF No. 93 at 20 n.1. The Court finds it best to reserve for separate motions practice whether good cause exists under Rule 16 and whether amendment is proper under Rule 15. *See Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 608 (9th Cir. 1992) (party seeking to amend pleading after date specified in scheduling order must first show "good cause" for amendment under Rule 16(b), then, if "good cause" is

shown, the party must demonstrate that amendment was proper under Rule 15). Such motions practice will permit a better evaluation of factors such as undue delay, bad faith, dilatory motive, undue prejudice, and futility of amendment.

## IV.    CONCLUSION

In conclusion, Plaintiff has put forth a number of different theories as to why she may have been improperly terminated given the events that transpired during the year preceding her termination, however based upon the comparator evidence, no triable issue exists as Defendant had legitimate justification for terminating Plaintiff when she removed company property from the store.

Accordingly, **IT IS HEREBY ORDERED**:

1.     Plaintiff's Motion to Exclude Defendant's Purported Expert Witness, **ECF No. 58**, is **DENIED.**

2.     Defendant's Motion for Partial Summary Judgment Requesting Dismissal of Plaintiff's Public Policy Claim, **ECF No. 46**, is **GRANTED IN PART** (justification element) and **DENIED IN PART** (clarity element).

3.     Defendant's Second Motion for Partial Summary Judgment Requesting Dismissal of Plaintiff's Public Policy Claim, **ECF No. 53**, is **GRANTED IN PART** (jeopardy element as to record keeping

and compliance with pharmacy law) and **DENIED IN PART** (jeopardy element as to unlicensed employees).

4.  Defendant's Motion for Partial Summary Judgment Dismissal on Plaintiff's Non-Public Policy Claims, **ECF No. 66**, is **GRANTED.**

5.  If Plaintiff seeks to add a claim for uncompensated overtime, a motion to amend must be filed **by no later than February 6, 2015,** Defendant's Response must be filed **by no later than February 13, 2015,** and Plaintiff's Reply must be filed **by no later than February 18, 2015.**

6.  If no motion is filed, the Court will consider the claim waived and will direct that Judgment be entered for Defendant.

7.  All deadlines prior to the March 4, 2015 Pretrial Conference imposed by the Court's Scheduling Orders, ECF Nos. 31, 87 & 119, are stayed pending further order of the Court.

**IT IS SO ORDERED.**  The Clerk's Office is directed to enter this Order and provide copies to all counsel.

**DATED** this 28th day of January 2015.

_____
SALVADOR MENDOZA, JR.
United States District Judge

Q:\SMJ\Civil\2013\Kelleher v. Kroger-3108\exclude.msjs.lc1.docx

ORDER - 46